UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Biopolymer Engineering, Inc., and
Massachusetts Institute of Technology,

      Plaintiffs,

v.                                                                                                Civil No. 05-2972 (JNE/JJG)
                                                                                             ORDER

Immudyne, Inc.,

      Defendant.

Darren B. Schwiebert, Esq., and Grant D. Fairbairn, Esq., Fredrikson & Byron, P.A., appeared for Plaintiffs Biopolymer Engineering, Inc., and Massachusetts Institute of Technology.

Kevin D. Conneely, Esq., and David D. Axtell, Esq., Leonard, Street and Deinard, P.A., and John R. Strawn, Jr., Esq., Cruse, Scott, Henderson & Allen, LLP, appeared for Defendant Immudyne, Inc.

      This is an action by Biopolymer Engineering, Inc. (Biopolymer), and Massachusetts Institute of Technology against Immudyne, Inc., for patent infringement, false advertising under the Lanham Act, and violations of the Minnesota Deceptive Trade Practices Act. The patents-in-suit include U.S. Patent Nos. 5,576,015 ('015 Patent) and 5,702,719 ('719 Patent). Two motions are before the Court: (1) Immudyne's motion for partial summary judgment or, in the alternative, a stay; and (2) Biopolymer's motion for partial summary judgment. The motions relate to Biopolymer's infringement claims that are based on the '015 Patent and the '719 Patent. For the reasons set forth below, the Court denies the motions.

## I.    BACKGROUND

      On June 29, 1993, U.S. Patent No. 5,223,491 ('491 Patent) issued to Byron Donzis. The '491 Patent is entitled "Method for Revitalizing Skin by Applying Topically Water Insoluble

1

Glucan." It contains one independent claim and nine dependent claims. The independent claim is:

> **1.** A method for revitalizing skin, comprising:
>
> applying topically to said skin a composition comprising:
>
> a carrier suitable for topical application to the skin; and
>
> a substantially purified water insoluble glucan extracted from yeast cell walls dispersed within said carrier in an amount of from about 0.1 mg per ounce to about 10 mg per ounce, wherein said revitalizing is selected from the group consisting of: reducing the number, depth or length of wrinkles of the skin, thickening of the skin, reducing irritation of the skin, reducing roughness of the skin, reducing redness of the skin, and reducing dryness of the skin.

In December 1994, Donzis licensed the '491 Patent to Donzis Research Laboratories, Inc., Donzis Research Laboratories licensed the patent to Carmel Research, Inc. (Carmel), and Carmel licensed the patent to Immudyne. The licenses are essentially the same. Article 1 of the Carmel-Immudyne license recites the grants made by Carmel to Immudyne:

> 1.1   Carmel hereby grants to ImmuDyne an exclusive sublicense to make, use and sell Licensed Products utilizing the inventions claimed in the Patent throughout the United States.
>
> 1.2   Carmel hereby agrees to disclose to ImmuDyne the licensed technology and to grant ImmuDyne a worldwide sublicense under said licensed technology to be used in conjunction with the sublicense under the Patent.
>
> 1.3   Carmel further agrees to disclose to ImmuDyne any improvements made to said invention and to allow ImmuDyne to make, use and sell said improvements during the term of this Agreement.
>
> 1.4   ImmuDyne may make, conceive, develop and acquire improvements relating to the Licensed Products within the scope of this Agreement during the term hereof. Such improvements shall become the exclusive property of Byron A. Donzis, owner of the Patent, ImmuDyne shall keep Carmel fully and promptly informed of the improvements, and Carmel hereby grants to ImmuDyne, to the extent Carmel is entitled to a license of such rights, a nonexclusive, royalty free sublicense on such improvements for the term of any patent issuing during the term of this agreement or any patent application filed during the term of this

agreement which results in an issued patent or for the term of this Agreement, whichever is longer.

In October 1996, litigation involving Donzis, Immudyne, and others commenced in Texas state court.  In October 1998, the Texas state court adopted a settlement agreement (*McLaughlin* settlement agreement).  *See Donzis v. McLaughlin*, 981 S.W.2d 58, 65 (Tex. App. 1998) (reversing and remanding district court's 1997 order because it added terms beyond scope of settlement agreement).  The *McLaughlin* settlement agreement "required certain reaffirmations and representations to be made regarding certain patents and related technology that were the subject of existing license agreements between the parties."[1]  *Id.*

---

[1]   The *McLaughlin* settlement agreement provides in part:

B.  PATENT TECHNOLOGY

1. Donzis and any Donzis owned or controlled entities, reaffirm that, as set forth in the license agreements between Donzis, Donzis Research, Inc. and Donzis Laboratories, Inc. and Carmel, Carmel is the sole and exclusive licensee worldwide for all patents currently licensed by said entities to Carmel, and shall be the sole and exclusive licensee for such patents and related technology and all improvements on such patents and related technology.

2. Carmel reaffirms that, as set forth in the license agreements between Carmel and Immudyne, Immudyne is the sole and exclusive licensee worldwide for all patents currently licensed to Immudyne, and shall be the sole and exclusive licensee for such patents and related technology and all improvements on such patents and related technology.

3. Donzis warrants and represents that, to the extent that Donzis owns any right, title or interest in the license agreement between Carmel and Immudyne, that Immudyne is the sole and exclusive licensee of all patents and related technology currently licensed to Immudyne.  Donzis further warrants and represents that, to the extent that Donzis owns any right, title or interest in the license agreement between Carmel and Immudyne, Immudyne shall be the sole and exclusive licensee of all improvements on patents currently licensed to Immudyne, and all related technology.

4. Carmel warrants and represents that, to the extent that Carmel owns any right, title or interest in the license agreement between Donzis, Donzis Research, Inc., Donzis Laboratories, Inc. and Carmel, that Carmel is the sole and exclusive

3

In the meantime, Donzis applied for and received three patents. On November 19, 1996, the '015 Patent issued from Application No. 396,940. The '719 Patent and U.S. Patent No. 5,705,184 ('184 Patent) issued on December 30, 1997, and January 6, 1998, respectively, from divisional applications based on Application No. 396,940. The '015 Patent, the '719 Patent, and the '184 Patent are entitled "Substantially Purified Beta (1,3) Finely Ground Yeast Cell Wall Glucan Composition with Dermatological and Nutritional Uses." Their specification is essentially the same and refers to the '491 Patent:

> Improved methods for isolating a purified water insoluble beta (1,3) glucan extract are disclosed in this inventor's earlier patent, [the '491 Patent], which is incorporated herein by reference in its entirety.
>
> The '491 patent further discloses the use of yeast extract beta (1,3) glucans as dermatological agents. Because of its insolubility in water, however, the glucans taught in the '491 tend to fall out of suspension in dermatological formulations, reducing the effectiveness of such formulation and rendering such formulations aesthetically undesirable. It would therefore be desirable to have an improved beta (1,3) glucan topical formulation more suitable for dermatological use, in particular one comprising a substantially purified beta (1,3) glucan that will not fall out of suspension prior to use. It would be further desirable to have a beta (1,3) glucan product that is useful as a nutritional supplement in a broad spectrum of animals, from crustaceans to humans.

The '015 Patent's sole independent claim is:

> **1.** A method for improving the growth and survival of animals comprising:
>
> administering an effective amount of a nutritional supplement to an animal, said nutritional supplement comprising a water-insoluble yeast cell wall extract comprising purified beta (1,3) glucan having a particle size of about 1.0 micron or less.

---

licensee of all patents and related technology currently licensed to Carmel. Carmel further warrants and represents that, to the extent that Carmel owns any right, title or interest in the license agreement between Donzis, Donzis Research, Inc., Donzis Laboratories, Inc. and Carmel, Carmel shall be the sole and exclusive licensee of all improvements on patents currently licensed to Carmel, and all related technology.

4

The '719 Patent's lone independent claim is: "A composition suitable for nutritional supplementation comprising a water-insoluble yeast cell wall extract comprising substantially purified beta (1,3) glucans having a particle size of about 1.0 microns or less." The '184 Patent's only independent claim is:

**1.**   A method for restoring skin, comprising:

applying topically to skin a composition comprising:

purified water-insoluble yeast extract beta (1,3) glucan, wherein said glucan has a particle size of about 1.0 microns or less.

In February 1999, Immudyne commenced an action in Texas state court against Donzis for breach of the *McLaughlin* settlement agreement. On June 23, 2000, the Texas state court entered final judgment, awarding Immudyne $600,000 plus pre- and post-judgment interest. Approximately eighteen months later, the Texas state court ordered Donzis to assign his "legal ownership interest" in the '015 Patent and the '719 Patent to Immudyne by December 31, 2001, to satisfy the judgment. If Donzis failed to do so, the Texas state court authorized a trustee to assign the patents to Immudyne. In February 2002, the trustee assigned the patents to Immudyne. On April 11, 2002, the trustee's assignments of the patents to Immudyne were recorded.

In the meantime, Donzis licensed and assigned the '015 Patent and the '719 Patent. In September 1999, Donzis licensed several patents, including the '015 Patent and the '719 Patent, to Biopolymer. A few months later, Biopolymer recorded the licenses. On June 8, 2000, Donzis assigned the '015 Patent and the '719 Patent to PSA Incorporated. PSA recorded the assignments on July 6, 2000. Approximately seventeen months later, Biopolymer and PSA entered into an Asset Purchase Agreement. The assets bought by Biopolymer included the '015 Patent and the '719 Patent. Biopolymer recorded the assignments in June 2002.

In October 2005, Immudyne brought an action for declaratory judgment in Texas (2005 Texas Action). In its petition, Immudyne asks the Texas state court to declare that paragraph B of the *McLaughlin* settlement agreement refers to and includes several patents including the '015 Patent and the '719 Patent and that Immudyne is therefore "the owner and sole and exclusive worldwide licensee" of the patents. In April 2006, the Texas state court granted Immudyne's motion for partial summary judgment and declared that Immudyne "has an exclusive license" to the '015 Patent and the '719 Patent. Final judgment has not been entered in that case.

Approximately two months after Immudyne brought the 2005 Texas Action, Biopolymer brought this action. Biopolymer and Immudyne now move for partial summary judgment.

## II.   DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the party opposing the motion to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A.      Immudyne's motion**

Immudyne asserts that it is entitled to summary judgment on Biopolymer's infringement claims that are based on the '015 Patent and the '719 Patent because it has a license to practice them. In the alternative, Immudyne maintains that the Court should stay Biopolymer's infringement claims that are based on the '015 Patent and the '719 Patent pending a final judgment in the 2005 Texas Action.

*1.      License*

License is a defense to patent infringement. *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, 72 F.3d 872, 878 (Fed. Cir. 1995). As the alleged infringer, Immudyne acknowledges its burden to establish its license. *See id.* Here, Immudyne asserts that it has an exclusive license to improvements to the '491 Patent pursuant to the Carmel-Immudyne license as confirmed by the *McLaughlin* settlement agreement, that the '015 Patent and the '719 Patent are improvements to the '491 Patent, and that its unrecorded license survives the subsequent license and assignment of the patents to Biopolymer. Biopolymer responds by arguing that neither the '015 Patent nor the '719 Patent is an improvement to the '491 Patent and, in the alternative, that the license and assignment of the '015 Patent and the '719 Patent to Biopolymer terminated Immudyne's purported license to the '015 Patent and the '719 Patent. *See* 35 U.S.C. § 261 (2000).

The Court begins by considering whether the '015 Patent and the '719 Patent are improvements within the meaning of the Carmel-Immudyne license as confirmed by the *McLaughlin* settlement agreement. Biopolymer does not dispute Immudyne's assertion that Texas law controls the interpretation of the Carmel-Immudyne license pursuant to the license's choice-of-law clause.

7

Under Texas law, the construction of an unambiguous contract presents a question of law. *Barrand, Inc. v. Whataburger, Inc.*, 214 S.W.3d 122, 129 (Tex. App. 2006); *McLaughlin*, 981 S.W.2d at 61. Whether a contract is ambiguous is a question of law. *Barrand*, 214 S.W.3d at 129; *McLaughlin*, 981 S.W.2d at 61. "A contract is unambiguous if it can be given a definite or certain legal meaning." *Certain Underwriters at Lloyd's Subscribing to Policy No. WDO-1000 v. KKM Inc.*, 215 S.W.3d 486, 491 (Tex. App. 2006). "[A] contract is ambiguous only if two or more meanings are genuinely possible after application of the pertinent rules of interpretation to the face of the instrument." *Barrand*, 214 S.W.3d at 129; *see McLaughlin*, 981 S.W.2d at 61. "Words used in an unambiguous contract are given their plain and ordinary meanings unless the instrument shows that the parties used the words in a technical or different sense." *Heil Co. v. Polar Corp.*, 191 S.W.3d 805, 810 (Tex. App. 2006). "Courts are allowed to use dictionaries in determining a word's plain, ordinary, and generally accepted meaning." *KKM*, 215 S.W.3d at 492. Here, the Court discerns no ambiguity in the meaning of "improvement."

As noted above, Carmel granted to Immudyne "an exclusive sublicense to make, use and sell Licensed Products utilizing the inventions claimed in the Patent [the '491 Patent] throughout the United States." The Carmel-Immudyne license contemplates Immudyne's disclosure to Immudyne of improvements made to the invention claimed in the '491 Patent. The Carmel-Immudyne license also contemplates improvements made, conceived, developed, or acquired by Immudyne. Neither the Carmel-Immudyne license nor the *McLaughlin* settlement agreement defines "improvement." *Merriam-Webster's Collegiate Dictionary* defines the term as:

> **1** : the act or process of improving  **2 a** : the state of being improved; *esp* : enhanced value or excellence  **b** : an instance of such improvement : something that enhances value or excellence

*Merriam-Webster's Collegiate Dictionary* 584 (10th ed. 2001). Definitions of "improve" include "to enhance in value or quality : make better." *Id.* Read as a whole, the Carmel-Immudyne license's and the *McLaughlin* settlement agreement's use of "improvement" is consistent with the term's ordinary meaning. Thus, the Court construes "improvement" as something that enhances value or quality or makes better.

According to Immudyne, no reasonable juror could find that the '015 Patent and the '719 Patent are not improvements within the meaning of the Carmel-Immudyne license as confirmed by the *McLaughlin* settlement agreement because Donzis is the named inventor of the '015 Patent, the '719 Patent, and the '491 Patent; the patents share a common subject matter; and the specification of the '015 Patent and the '719 Patent incorporates the '491 Patent. The Court is not persuaded by Immudyne's argument because it ignores the "bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quotations omitted), *cert. denied*, 126 S. Ct. 1332 (2006); *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004).

Immudyne's rights to the patents allegedly arise out of section 1.3 of the Carmel-Immudyne license, which provides: "Carmel further agrees to disclose to ImmuDyne *any improvements made to said invention* and to allow ImmuDyne to make, use and sell *said improvements* during the term of this Agreement." (Emphasis added.) Section 1.1 of the license reveals that "said invention" in section 1.3 refers to the invention claimed in the '491 Patent. As noted above, the '491 Patent claims a method for revitalizing skin comprising topical application of a composition to skin. Notwithstanding their title and specification, neither the '015 Patent

9

nor the '719 Patent claims an invention directed to dermatological uses.[2] The '015 Patent claims a method for improving animal growth and survival comprising administration of an effective amount of a nutritional supplement. The '719 Patent claims a composition suitable for nutritional supplementation. Consequently, neither the '015 Patent nor the '719 Patent claims an invention that enhances in value or quality the method for revitalizing skin claimed in the '491 Patent. The inventions claimed in the '015 Patent and the '719 Patent do not make the invention claimed in the '491 Patent better. Accordingly, the Court rejects Immudyne's assertion that no reasonable juror could find that neither the '015 Patent nor the '719 Patent is an improvement within the meaning of the Carmel-Immudyne license as confirmed by the *McLaughlin* settlement agreement.[3]

Immudyne nevertheless contends that Biopolymer is estopped from asserting that the '015 Patent and the '719 Patent are not improvements to the '491 Patent because Biopolymer "never accused" Immudyne of infringing the '015 Patent and the '719 Patent—until this action. Immudyne cites no authority to support its contention. In a letter dated April 7, 2000, Immudyne

---

[2] Notwithstanding its title and specification, the '184 Patent makes no claim to an invention directed to nutritional uses. It claims a method for restoring skin comprising topical application of a composition to skin.

The prosecution history of the '015 Patent explains why the '015 Patent, the '719 Patent, and the '184 Patent share a title and specification. During the prosecution of the '015 Patent, the examiner determined that Application No. 396,940 claimed three distinct inventions. The examiner therefore required Donzis to restrict the application to one invention. The '015 Patent eventually issued from the restricted application. After restricting the application, Donzis filed divisional applications that claimed the other two inventions. The divisional applications ultimately yielded the '719 Patent and the '184 Patent. In filing divisional applications, Donzis had to submit a copy of the prior application. *See* 37 C.F.R. § 1.60(b) (1996).

[3] The Court acknowledges the Texas state court decided in April 2006 that Immudyne has an exclusive license to the '015 Patent and the '719 Patent. The Texas state court did not disclose its reasoning. Immudyne does not assert that the Texas state court's decision is binding here; final judgment in the 2005 Texas Action has not issued. For the reasons set forth above, the Court respectfully disagrees with the Texas state court's April 2006 decision.

acknowledges Biopolymer's assertion that Donzis licensed "all his beta-glucan related patents" to Biopolymer. A reasonable factfinder could infer that Biopolymer notified Immudyne of Biopolymer's rights to the '015 Patent and the '719 Patent within a few months of the September 1999 license. Viewed in the light most favorable to Biopolymer, the record reveals that Biopolymer is not estopped from asserting that neither the '015 Patent nor the '719 Patent is an improvement to the '491 Patent. *See Brekke v. THM Biomed., Inc.*, 683 N.W.2d 771, 777 (Minn. 2004) (reciting elements of equitable estoppel under Minnesota law); *Barrand*, 214 S.W.3d at 146 (reciting elements of equitable estoppel under Texas law).

In short, viewed in the light most favorable to Biopolymer, the record reveals that Immudyne did not obtain a license to the '015 Patent or the '719 Patent in the Carmel-Immudyne license as confirmed by the *McLaughlin* settlement agreement. The Court therefore denies Immudyne's motion for partial summary judgment.

*2. Stay*

Immudyne moves in the alternative to stay Biopolymer's infringement claims that are based on the '015 Patent and the '719 Patent pending a final judgment in the 2005 Texas Action. Biopolymer opposes the motion.

Federal courts have a "virtually unflagging obligation … to exercise the jurisdiction given them." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976); *see Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) ("We have often acknowledged that federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress."). "This duty is not, however, absolute." *Quackenbush*, 517 U.S. at 716. A federal court may decline to exercise its jurisdiction, in exceptional circumstances, "where denying a federal forum would clearly serve an important countervailing interest, for

example, where abstention is warranted by considerations of 'proper constitutional adjudication,' 'regard for federal-state relation,' or 'wise judicial administration.'" *Id.* (citations omitted) (quoting *Colorado River*, 424 U.S. at 817). Here, Immudyne relies on the "wise judicial administration" aspect of *Colorado River* to support its motion to stay.

In *Colorado River*, the Supreme Court identified several factors relevant to the decision of whether to dismiss a federal action due to the presence of a concurrent state action for reasons of wise judicial administration:

> It has been held, for example, that the court first assuming jurisdiction over property may exercise that jurisdiction to the exclusion of other courts. . . . In assessing the appropriateness of dismissal in the event of an exercise of concurrent jurisdiction, a federal court may also consider such factors as the inconvenience of the federal forum, the desirability of avoiding piecemeal litigation, and the order in which jurisdiction was obtained by the concurrent forums. No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counselling against that exercise is required. Only the clearest of justifications will warrant dismissal.

*Colorado River*, 424 U.S. at 818-19 (citations omitted). The Supreme Court later reiterated that "the decision whether to dismiss a federal action because of parallel state-court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983). *Moses H. Cone* added two factors to the list set forth in *Colorado River*: (1) whether state or federal law controls; and (2) the adequacy of the state forum to protect the federal plaintiff's rights. *Id.* at 23-26.

In this case, the Court concludes that a stay is not warranted under the relevant factors identified in *Colorado River* and *Moses H. Cone*. *See Pirkle v. Ogontz Controls Co.*, 852 F.2d 1293 (Fed. Cir. 1988) (unpublished table decision) (analyzing under *Colorado River* and *Moses*

*H. Cone* district court's stay of patent infringement action pending final determination of state court action in which patent ownership was at issue). With regard to the "priority" factor, "priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." *Moses H. Cone*, 460 U.S. at 21. Immudyne commenced the 2005 Texas Action approximately two months before Biopolymer brought this action, but substantial progress has been made here. Immudyne filed its motion to stay near the close of the period set for factual discovery in the pretrial order and in the middle of the parties' discovery relating to claim construction. As noted above, the Texas state court granted Immudyne's motion for partial summary judgment in April 2006. The record does not reveal what progress has since been made in that case.

Next, a stay is unlikely to avoid piecemeal litigation. Immudyne's motion for partial summary judgment raised the possibility of this Court reaching a conclusion that differs from that of the Texas state court. Immudyne's petition in the 2005 Texas Action seeks an interpretation of the *McLaughlin* settlement agreement. Biopolymer's claim to the '015 Patent and the '719 Patent arises out of events that took place after that agreement.

Third, both state and federal laws apply to the dispute between Biopolymer and Immudyne over rights to the '015 Patent and the '719 Patent. State law controls the interpretation of the Carmel-Immudyne license as confirmed by the *McLaughlin* settlement agreement. *See Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 284 F.3d 1323, 1327-28 (Fed. Cir. 2002). Federal law applies to Biopolymer's assertion that its subsequent license and purchase of the '015 Patent and the '719 Patent voids Immudyne's purported license. *See id.*

Finally, the Court perceives no inadequacy in the Texas state court's ability to protect Biopolymer's rights with regard to the license and ownership interests in the '015 Patent and the

13

'719 Patent that allegedly arise out of the Carmel-Immudyne license as confirmed by the *McLaughlin* settlement agreement. *See Int'l Nutrition Co. v. Horphag Research Ltd.*, 257 F.3d 1324, 1329 (Fed. Cir. 2001). Under the circumstances of this case, this factor is not entitled to great weight. *See Gov't Employees Ins. Co. v. Simon*, 917 F.2d 1144, 1149 (8th Cir. 1990).

Having considered the relevant factors of *Colorado River* and *Moses H. Cone*, the Court does not perceive the exceptional circumstances necessary to render a stay permissible or appropriate. *See Moses H. Cone*, 460 U.S. at 28 (stating that "it would be a serious abuse of discretion" to stay where a district court harbors substantial doubt as to whether "the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties"). The Court therefore denies Immudyne's motion to stay.

**B.     Biopolymer's motion**

Biopolymer asserts that it is entitled to summary judgment on its infringement claims that are based on the '015 Patent and the '719 Patent. An infringement analysis has two steps. First, the court determines the meaning and scope of the patent claims asserted to be infringed. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). Second, the court compares the properly construed claims to the device accused of infringing. *Id.* Here, the '015 Patent's independent claim requires "a water-insoluble yeast cell wall extract comprising purified beta (1,3) glucan having a particle size of about 1.0 micron or less," and the '719 Patent's independent claim requires "a water-insoluble yeast cell wall extract comprising substantially purified beta (1,3) glucans having a particle size of about 1.0 microns or less." Biopolymer cites an analysis of Immudyne's accused product to demonstrate that the particle size of glucan in the accused product is within the claimed range. The analysis asserts that the sample has "two obvious size ranges, one that has a sub-micron average and another

averaging ~4 microns," and that "[t]he particles that range in size from ~2.5 microns to 6 microns have several features that are consistent to identify them as yeast cells." Biopolymer does not direct the Court to a similar description of the smaller particles. Consequently, it has not satisfied its burden to obtain summary judgment.[4] *See L&W, Inc. v. Shertech, Inc.*, 471 F.3d 1311, 1317-18 (Fed. Cir. 2006). The Court therefore denies Biopolymer's motion.

### III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Immudyne's motion for partial summary judgment or, in the alternative, a stay [Docket No. 50] is DENIED.

2. Biopolymer's motion for partial summary judgment [Docket No. 80] is DENIED.

Dated: April 20, 2007

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge

---

[4] Biopolymer contends that there is no genuine issue of material fact as to whether Immudyne infringes the asserted claims in the '015 Patent and the '719 Patent because Immudyne failed to present any substantive challenge to Biopolymer's claim chart. The pretrial scheduling order required Immudyne's claim chart to "indicate with specificity which elements on [Biopolymer's] Claim Chart [Immudyne] admits are present in its accused device or process, and which it contends are absent," and to "set forth in detail the basis for [Immudyne's] contention that the element is absent." With regard to the '015 Patent and the '719 Patent, Immudyne's claim chart asserted that Immudyne had moved for a protective order "to prevent (or defer) any discovery or other pretrial activities as to the asserted Donzis patents," that Immudyne "will respond, if required to do so, to the asserted Donzis patents" after the Court rules on the motion for a protective order, and that Biopolymer's claim chart failed to demonstrate literal infringement. Immudyne also offered a few examples that allegedly show its accused product does not infringe the '015 Patent and the '719 Patent. With regard to the '015 Patent and the '719 Patent, Immudyne's claim chart complies with neither the letter nor the spirit of the pretrial scheduling order. Nevertheless, the Court is not persuaded that Immudyne's failure to comply with the pretrial scheduling order entitles Biopolymer to summary judgment.